UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMIAH GREER, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>- v. -<br><br>PAPA JOHN'S INTERNATIONAL, INC.<br><br>Defendant. | Docket No. _____<br><br>Judge _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jamiah Greer ("Plaintiff") complains upon knowledge as to herself and her acts and upon information and belief as to all other matters, against Defendant Papa John's International, Inc. ("PJI") for its violations of law between at least as early as 2008 until the present (the "Class Period") as follows:

## INTRODUCTION

1. Defendant PJI owns and operates approximately 700 pizza restaurants in the United States under the "Papa John's" brand. More than 90% of PJI's 22,400 employees work in these restaurants according to PJI's 2017 Annual Statement.

2. PJI also licenses the Papa John's brand to franchisees who operate approximately 2,600 restaurants nationwide. PJI's franchisees collectively employ approximately 50,000 individuals who are responsible for running the daily operations of their stores.

3. One of the largest expenses associated with running a Papa John's restaurant are labor costs. These costs are so significant that PJI acknowledged in its 2017 annual report that "higher labor costs and increased competition for qualified team members" presented a substantial risk to its business.

4. To address this issue, PJI and its franchisees sought to artificially reduce their labor costs during the Class Period by entering into an agreement not to compete for individuals employed by other Papa John's restaurants. This "No Hire Agreement" was a standardized part of every franchise agreement entered between PJI and its franchisees since at least 2008. It states that:

> Franchisee covenants not to, during the Term and for a period of one year after expiration or termination of the Franchise, employ or seek to employ any person who is employed by Papa John's International, Inc., its Affiliates or by any of its franchisees, or otherwise directly or indirectly solicit, entice or induce any such person to leave their employment.

5. The Attorney General for the State of Washington (the "Washington AG") initiated an investigation into PJI and its use of the No Hire Agreement to restrain competition in the labor market in January 2018.

6. The Washington AG concluded in July 2018 that PJI's No Hire Agreement constitutes an agreement in restraint of trade that "restricts worker mobility and decrease[s] competition for labor by preventing workers from moving among the chain[]'s franchise locations."[1] The Washington AG also determined that this reduction in competition artificially reduced employee compensation during the Class Period by "put[ting] downward pressure on wages."[2] As a result of these findings, in September 2018, PJI and the Washington AG entered into a judicial consent order requiring PJI to remove the No Hire Agreement from its franchise agreements.

7. Economists have confirmed the Washington AG's findings that no-hire agreements, like the one implemented among PJI and its franchisees, suppress employee compensation by artificially reducing competition in the labor market. For example, in a 2018 study published in the Journal of Labor Economics, a group of Princeton economists concluded that the use of no hire

---

[1] *See AG Ferguson Announces Fast-Food Chains Will End Restrictions on Low-Wage Workers Nationwide*, Washington State Office of the Attorney General, (Jul. 12, 2018) available at https://www.atg.wa.gov/news/news-releases/ag-ferguson-announces-fast-food-chains-will-end-restrictions-low-wage-workers.

[2] *Id.*

agreements is one of the main reasons why "wage growth [] remain[s] surprisingly sluggish" even as unemployment reaches historical lows and demand for labor remains high.

8. Plaintiff was directly harmed as a result of the No Hire Agreement among PJI and its franchisees. Plaintiff was employed by a Papa John's restaurant in 2017. Plaintiff applied for a position at a different Papa John's location. Plaintiff was informed that, while she was well qualified for this job based on her experience at another Papa John's restaurant, she could not be hired until the owners of the new location "checked with" her current employer. Plaintiff was not offered that position because of the No Hire Agreement.

9. Given the long-term, widespread, and secretive nature of the conspiracy among PJI and the franchisees operating Papa John's restaurants nationwide, in addition to the existence of government investigations into the use of the No Hire Agreement to restrain competition in the labor market, Plaintiff believes that additional information supporting the claims alleged herein will be revealed after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11. Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, and 28 U.S.C. § 1391(b) because PJI implemented the unlawful No Hire Agreement in this District, including with franchisees operating at least 12 Papa John's restaurants in this District during the Class Period.

12. The Court has personal jurisdiction over PJI because it engaged in suit-related conduct in New York and in this District. Specifically, PJI operates Papa John's restaurants in New York and in this District and used the No Hire Agreement to restrict competition in the labor market within United States and this District to artificially suppress compensation earned by individuals employed at Papa John's restaurants.

## PARTIES

13.     Plaintiff Jamiah Greer is a resident of Cobb County, Georgia. Plaintiff was employed by a Papa John's restaurant located in Austell, Georgia during the Class Period. As alleged herein, Plaintiff applied for and was denied employment at another Papa John's location because of the Papa John's No Hire Agreement. Additionally, Plaintiff suffered monetary losses because she received less compensation while employed at a Papa John's restaurant than she should have during the Class Period.

14.     Defendant PJI is a Delaware corporation with its principal place of business at 2002 Papa John's Boulevard, Louisville, Kentucky. PJI operates "company-owned" Papa John's restaurants (as described in ¶¶ 16-18) through its wholly-owned subsidiary Papa John's USA, Inc. ("PJ USA").

15.     PJI and PJ USA operate as a single entity. PJI is: (1) the single decision-making source for both PJI and PJ USA, and (2) exercises definitive control over and has common ownership of company-owned Papa John's restaurants with PJ USA.

16.     As of 2017, PJI and PJ USA not only operated out of the same location, they shared the same directors and executives, as shown in the table below:

| **PJI** | **PJ USA** |
|---|---|
| **John H. Schnatter** = Chairman and Chief Executive Officer. | **John H. Schnatter** = Chairman and Chief Executive Officer. |
| **Lance F. Tucker** = Chief Financial Officer, Treasurer, Senior Vice President ("SVP"), Chief Accounting Officer. | **Lance F. Tucker** = Chief Financial Officer, Treasurer, Vice President ("VP"), Board Member. |
| **Steve M. Ritchie** = President, Chief Operating Officer. | **Steve M. Ritchie** = President, COO, Board Member. |
| **Sean A. Muldoon** = SVP, Chief Ingredient Officer. | **Sean A. Muldoon** = VP. |

| | |
|---|---|
| **R. Shane Hutchins** = SVP, Papa John's Food Service | **R. Shane Hutchins** = VP. |
| **Caroline Oyler** = SVP, General Counsel. | **Caroline Oyler** = VP. |
| **Jack H. Swaysland** = SVP, International. | **Jack H. Swaysland** = VP. |
| **Timothy O'Hern** = SVP, Chief Development Officer. | **Timothy O'Hern** = VP. |
| **Edmond Heelan** = SVP, North American Operations. | **Edmond Heelan** = VP. |
| **Robert E. Thompson** = SVP, Marketing. | **Robert E. Thompson** = VP. |

17. PJI does not distinguish itself from PJ USA in in its Annual Reports, taking responsibility for both the operation of Papa John's restaurants and licensing of the Papa John's brand to franchisees:

> Papa John's International, Inc., a Delaware corporation (referred to as the "Company", "Papa John's" or in the first person notations of "we", "us" and "our") operates and franchises pizza delivery and carryout restaurants and, in certain international markets, dine-in and delivery restaurants under the trademark "Papa John's".

18. PJI also refers to company-owned restaurants that it operates through PJ USA as its own. For example, in the same 2017 Annual Report, PJI stated that:

> Although most of our domestic Company-owned markets are well-penetrated, our Company-owned growth strategy is to continue to open domestic restaurants in existing markets as appropriate, thereby increasing consumer awareness and enabling us to take advantage of operational and marketing efficiencies.

## FACTUAL ALLEGATIONS

**I.    PJI's Business Model.**

19. PJI runs a franchise business. Franchising is a method for expanding a business and distributing goods and services through a licensing agreement. In a typical franchise agreement, a person or company (the "franchisor") licenses its brand and operating methods to a third-party (the "franchisee"). The franchisor provides support for the brand, for example, by coordinating

5

advertising and developing intellectual property, while the franchisee independently operates their business using the franchisor's brand and methods. Significantly, while the franchisor and franchisee share a brand image, they are *not* in a partnership or part of the same company, but independent businesses that often compete in the same market.

20.     There were approximately 2,600 franchised Papa John's restaurants in the United States at the end of 2017. PJI reported in its 2017 annual statement that North American franchise restaurants (including those in the United States) generated approximately $2.3 billion in revenue and paid $106,729,000 in franchise royalties and fees.

21.     PJI also directly operates approximately 700 Papa John's restaurants throughout the United States. These "company-owned" restaurants (and PJI) compete with franchised restaurants (and franchisees) to attract customers and the best employees.

22.     More than 90% of PJI employees work in company-owned restaurants. PJI's remaining employees perform corporate functions relating to activities like brand promotion, marketing, intellectual property development, or legal matters.

23.     PJI earned approximately $816,718,000 in revenue from its domestic company-owned restaurants during the 2017 fiscal year.

24.     According to PJI, one of the greatest challenges to its business model is recruiting and retaining qualified staff for Papa John's restaurants. For example, PJI warned its investors in its 2017 Annual Report that "[h]igher labor costs and increased competition for qualified team members increases the cost of doing business and ensuring adequate staffing in our restaurants." It expanded on this risk as follows:

> Our success depends in part on our and our franchisees' ability to recruit, motivate and retain a qualified workforce to work in our restaurants in an intensely competitive environment. **Increased costs associated with recruiting, motivating and retaining qualified employees to work in Company-owned and franchised restaurants have had a negative impact on our Company-owned**

6

> **restaurant margins and the margins of franchised restaurants.**
> (emphasis added)

25. Despite the critical importance of "recruiting, motivating, and retaining qualified employees to work in company-owned and franchised restaurants," PJI reports that most of its 19,400 "team members" who work in company-owned stores "work part-time and are paid on an hourly basis." PJI pays a "significant number" of these hourly personnel "rates close to the federal and state minimum wage requirements." The same is true of franchised stores.

26. PJI recognizes that labor costs are very significant expenditures for itself and for its franchisees. In the same 2017 Annual Report, it disclosed to investors that it is highly sensitive to any increase in labor costs, writing that "increases in labor . . . costs could adversely affect the profitability of our restaurant business," and that "[l]abor costs and labor-related benefits are primary components in the cost of operation of our restaurants . . . ."

27. For example, in 2009, the average cost of labor for a company-owned restaurant was $168,972, comprising 19.7% of sales. The following year, the cost of labor for the average company-owned restaurant rose to $171,830, comprising 20.2% of sales. And in 2011, the costs of labor again rose to $177,384, comprising 20.1% of sales.

28. PJI recognized in the 2017 Annual Report that it looks for "experienced restaurant managers and staff" and writes that brand-specific training is "very important to delivering consistent operational execution." In a competitive market, demand among Papa John's restaurants for employees with experience working at other Papa John's restaurants would be high because these employees have brand-specific skills and experience that others lack. Higher demand for these employees would have benefitted employees during the Class Period by increasing competition among PJI and its franchisees to attract the most qualified workers by increasing compensation and/or offering other benefits.

## II.  The Papa John's No Hire Agreement.

29.  PJI and its franchisees chose to deal with the employee "recruitment, compensation, and retention" problem by including standardized language in all franchise agreements banning competition for Papa John's employees. The agreement stated that:

> Franchisee covenants not to, during the Term and for a period of one year after expiration or termination of the Franchise, employ or seek to employ any person who is employed by Papa John's International, Inc., its Affiliates or by any of its franchisees, or otherwise directly or indirectly solicit, entice or induce any such person to leave their employment.

30.  This No Hire Agreement is plainly anticompetitive. It contains no limitations whatsoever, has no geographic restrictions, and does not have any limits on the time period it covers. It applies to all employees regardless of their compensation level, full-time or part-time status, performance, years of service, or level of training. It applies to established franchisees as well as to new franchisees. As a result, there is no legitimate, pro-competitive purpose served by the No Hire Agreement.

## III. The Papa John's No Hire Agreement Reduced Employee Compensation and Competition for Employees at all Papa John's Restaurants.

31.  Two economists at Princeton University, Alan B. Krueger and Orley Ashenfelter, conducted a detailed analysis of the use of no-hire agreements by franchise businesses. They published their findings in the peer-reviewed Journal of Labor Economics in 2018.

32.  Drs. Krueger and Ashenfelter analyzed over 150 different franchise agreements and associated labor market data. They concluded that no-hire agreements, like the one included in PJI's franchise agreements, reduce the competition for labor supply, which in turn "raises employer market power and enables companies to pay workers less than their contribution to productivity."[3]

---

[3] Alan B. Krueger and Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, at *16 (Jul. 2018), available at http://ftp.iza.org/dp11672.pdf.

8

These same economists also found that no-hire agreements are most prevalent in industries with high employee turnover rates, which indicates that no-hire agreements are implemented to prevent turnover by reducing the competition for labor supply. Thus, the prevalence of no-hire agreements in these industries can "explain a recent puzzle in the U.S. job market: unemployment has reached a 16-year low and job openings are at an all-time high, yet wage growth has remained surprisingly sluggish."

33. Government regulators agree that no hire agreements like the Papa John's No Hire Agreement are naked restraints of trade that suppress employee compensation. For example, the Washington AG launched an investigation into PJI's use of the No Hire Agreement in January 2018. The Washington Attorney General concluded that no hire agreements, including the Papa John's No Hire Agreement, constitute agreements in restraint of trade because they "restrict[] worker mobility and decrease[] competition for labor by preventing workers from moving among the chains' franchise locations."[4] The Washington Attorney General also explained that no-hire covenants "put downward pressure on wages and restrict worker mobility."[5]

34. The Department of Justice Antitrust Division and the Federal Trade Commission agreed, issuing joint guidance in October 2016 declaring that the DOJ would criminally prosecute naked[6] no poach agreements[7] as *per se* unlawful market allocation agreements among horizontal competitors in the labor market, in violation of the Sherman Act.

---

[4] *See* fn. 1, above, available at https://www.atg.wa.gov/news/news-releases/ag-ferguson-announces-fast-food-chains-will-end-restrictions-low-wage-workers.

[5] *Id.*

[6] The term "naked" means that the agreement is not ancillary to a pro-competitive venture, such as a no-hire agreement of limited duration that is executed as part of a merger or acquisition. As explained in this Complaint, the Papa John's No Hire Agreement is not related to any pro-competitive venture because it has no limitations whatsoever. *See* Part II, above.

[7] A "no poach agreement" is an agreement not to actively recruit an employee from a competitor.

9

35. The Papa John's No Hire Agreement is worse than the type of no poach agreements that the Department of Justice Antitrust Division and the Federal Trade Commission have deemed unlawful *per se* because it goes beyond banning active recruitment. It bans Papa John's franchisees from hiring employees of another Papa John's franchisee or any company-owned stores, even if the employee applies to a position on her own initiative, no matter the circumstances.

### IV. Plaintiff was Injured by the Papa John's No Hire Agreement.

36. Plaintiff Jamiah Greer worked at a Papa John's restaurant in Austell, Georgia during 2017. Plaintiff subsequently applied for a position at a different Papa John's restaurant. This new position provided an opportunity for more hours and an increase in compensation.

37. During the interview process, Plaintiff was told that, while her experience working at Papa John's made her an ideal candidate for this job, her current employer had to be consulted before she was offered the position.

38. Plaintiff followed up several times with this Papa John's restaurant regarding the status of her application in the coming weeks. Each time she was told that a new requirement, such as additional paperwork or documentation, prevented her from being hired at that time. These requirements were purely pretextual and not legitimate.

39. Plaintiff was not offered that position without explanation because of the No Hire Agreement alleged herein.

40. Plaintiff suffered monetary losses and an antitrust injury resulting from the No Hire Agreement among PJI and its franchisees because this anticompetitive conduct caused her to: (1) receive less compensation during her employment at a Papa John's restaurant than she should have; and (2) be denied the opportunity to fairly compete for employment at another Papa John's restaurant.

## **CLASS ACTION ALLEGATIONS**

41. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on her own behalf and as representative of the following Class:[8]

> All persons in the United States that worked in Papa John's restaurants between at least as early as January 1, 2008 and the present (the "Class Period").

42. The following common questions pertain to all Class members and predominate over any questions pertaining to individual Class members:

   a. Whether PJI orchestrated a conspiracy to restrain competition in the market for the supply of labor;

   b. Whether the No Hire Agreement constitutes a violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*;

   c. Whether PJI's conduct caused the Class to suffer an antitrust injury by reducing, stabilizing, and suppressing employee compensation;

   d. The amount of damages caused by the No Hire Agreement;

   e. Whether the Class is entitled to injunctive relief prohibiting Papa John's from continuing its anticompetitive conduct in violation of the Sherman Act, 15 U.S.C. § 1, *et seq.*;

   f. Whether PJI and its franchisees were unjustly enriched at the expense of Plaintiff and Class members as a result of the No Hire Agreement.

43. The claims asserted herein are typical of the claims of all Class members because all Class members sustained the same type of injury, namely: (1) a reduction in wages; (2) a denial of the opportunity to fairly compete for increased compensation and other desirable benefits by applying to another Papa John's store; and (3) denial of an increase in compensation and employment benefits from their current employer that would have otherwise been necessary to retain the employee but for the Papa John's No Hire Agreement.

---

[8] Plaintiff has defined the Class based on currently available information and hereby reserves the right to amend the Class definition, including, without limitation, membership criteria and the Class Period.

11

44. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, there are thousands of Class members nationwide. As of December 31, 2017, there were 5,199 Papa John's restaurants globally, 3,314 of which were located in the United States, employing thousands of geographically dispersed Class members.

45. Plaintiff is an adequate representative and will fairly protect the interests of the Class. She has retained counsel experienced in Class action antitrust litigation to adequately guide the prosecution of this action in the best interest of the Class members.

46. A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable, unduly burdensome and costly for each Class member, the Court, and PJI. Additionally, proceeding in separate actions would risk inconsistent or varying adjudications of questions of law and fact common to all Class members.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

47. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any of the facts that could or would have reasonably led to the discovery thereof, until the Washington AG announced in January 2018 that PJI and its franchisees entered the Papa John's No Hire Agreement.

48. Plaintiff and the Class could not have discovered the existence of this unlawful agreement through reasonable inquiry. For example, PJI and its franchisees did not disclose to Plaintiff or the Class that the Papa John's No Hire Agreement existed or that it governed their employment at a Papa John's restaurant. Nor did PJI or its franchisees distribute copies of the No Hire Agreement to their employees, including Plaintiff and Class members. And because Plaintiff and the Class were not parties to the No Hire Agreement, they were not asked to acknowledge or consent to its terms during the hiring process.

49.     Due to PJI's fraudulent concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class has been tolled during the period of such fraudulent concealment.

## COUNT I
## VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1, *et seq.*

50.     Plaintiff hereby re-alleges and re-incorporates all preceding and succeeding paragraphs as though fully set forth herein.

51.     Beginning at least in 2008, PJI orchestrated a horizontal market allocation agreement between and among PJI, its subsidiaries, and its franchisees that operated Papa John's restaurants by entering into and enforcing an agreement that prohibited franchisees from competing with each other, and with PJI and its subsidiaries, for labor supplied by Plaintiff and the Class.

52.     Since at least 2008, Papa John's included the following language or substantially similar language in its franchise agreements:

> Franchisee covenants to not, during the Term and for a period of one year after expiration or termination of the Franchise, employ or seek to employ any person who is employed by Papa John's International, Inc., its Affiliates or by any of its franchisees, or otherwise directly or indirectly solicit, entice or induce any such person to leave their employment.

53.     The language above is direct evidence of an unlawful agreement between PJI and its franchisees to allocate the supply of labor provided by Plaintiff and the Class.

54.     This No Hire Agreement directly harmed Plaintiff and the Class, who supplied labor to PJI, its subsidiaries, and franchisees that operate Papa John's restaurants. Plaintiff and the Class were deprived of a competitive market for their labor, thereby losing many advantages that they would have received in an unrestrained market such as increased compensation, more desirable working conditions, and other benefits.

55. There are no legitimate business justifications or pro-competitive benefits related to the No Hire Agreement. It is unmoored from any pro-competitive venture because it extends for an indefinite period of time and applies to all employees, regardless of whether these employees have received specialized training or skills. It is an agreement between and among PJI and its franchisees, who are horizontal competitors in the market for employees to work at Papa John's restaurants. Accordingly, the No Hire Agreement is a *per se* violation of the Sherman Act.

56. As a direct, material, and proximate result of Defendants' violation of § 1 of the Sherman Act, Plaintiffs and the Class have suffered injury to their business and property, within the meaning of § 4 of the Clayton Act throughout the Class Period.

57. Plaintiffs and members of the Class seek treble damages for Defendants' violations of § 1 of the Sherman Act and under § 4 of the Clayton Act.

58. Plaintiffs and members of the class also seek an injunction against Defendant, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT II
## UNJUST ENRICHMENT

59. Plaintiff hereby re-alleges and re-incorporates all preceding and succeeding paragraphs as though fully set forth herein.

60. PJI benefitted financially from the Papa John's No Hire Agreement because it reduced its cost of labor, thereby: (1) increasing the value of Papa John's franchises, which enabled PJI to license a greater number of franchises and collect greater royalties from franchisees, and (2) substantially increasing PJI's profit margins on company-owned stores.

61. The foregoing unlawful acts caused Plaintiff and the Class to suffer substantial injury by being unable to benefit from a competitive market for their supply of labor and were deprived of increased compensation, conditions of employment, and benefits.

62. Accordingly, it would be unjust and inequitable to allow PJI to retain these benefits and equity and good conscience require that PJI's gains from instituting and enforcing the Papa John's No Hire Agreement be remitted to Plaintiff and the Class.

## PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A. For an order certifying this lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23, and designating Plaintiff as Class representative, and that Plaintiff's counsel be appointed Class counsel;

B. That the unlawful conduct alleged herein be adjudged and decreed to violate § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

C. That PJI be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint under § 16 of the Clayton Antitrust Act, 16 U.S.C. § 26;

D. That the Court award Plaintiff and the Class damages against PJI for its violation of federal antitrust laws, in an amount to be trebled under § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, plus interest;

E. That the Court order PJI to disgorge its ill-gotten gains from which a constructive trust be established for restitution to Plaintiff and the Class;

F. For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

G. That the Court award Plaintiff and the Class prejudgment interest at the maximum rate allowable by law; and

H. That the Court directs such further relief as it may deem just and proper.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all issues so triable.

Dated: December 4, 2018
White Plains, New York

Respectfully submitted,

LOWEY DANNENBERG, P.C.
/s/ Vincent Briganti

15

Vincent Briganti
Christian Levis
Roland R. St. Louis, III

44 South Broadway, Suite 1100
White Plains, NY 10601
Tel.: (914) 997-0500
Fax: (914) 997-0035
Email: vbriganti@lowey.com
clevis@lowey.com
rstlouis@lowey.com